CLARENCE R. HARRELL, Executor of the Estate of ANNIE MAE HARRELL,[1] Employee, Plaintiff v. HARRIET & HENDERSON YARNS, Employer, and LIBERTY MUTUAL INSURANCE COMPANY, Carrier, Defendants

No. 198PA83

(Filed 5 November 1985)

1. **Master and Servant § 68— workers' compensation—obstructive lung disease—cotton dust exposure as cause**

   There was sufficient evidence from which the Industrial Commission could have found that cotton dust exposure was a significant causal factor in the development of plaintiff's obstructive lung disease where a physician specializing in pulmonary diseases testified that "She probably has obstructive impairment caused by cotton dust exposure" and "I feel there is an element of

---

1. While this matter was pending in the Court of Appeals, Annie Mae Harrell died. After this Court allowed the petition for further review Clarence R. Harrell, executor under Annie Mae Harrell's will, moved to be substituted as party plaintiff and this Court allowed the motion.

pulmonary impairment present which could have been contributed to by her cotton dust exposure."

**2. Master and Servant § 68— workers' compensation—cause of disability—occupational and nonoccupational diseases—remand for findings**

Where the Industrial Commission made contradictory findings supported by the evidence as to whether occupational obstructive lung disease (byssinosis) or nonoccupational restrictive lung disease (pulmonary fibrosis) was the cause of plaintiff's wage-earning disability, the case must be remanded to the Industrial Commission for a determination of the cause of plaintiff's disability. Because the evidence in this case does not permit any reasonable apportionment of plaintiff's disability between occupational and nonoccupational disease, plaintiff is entitled to an award for her entire disability under G.S. 97-52 and G.S. 97-29 if her occupational disease was a substantial and material factor in bringing about that disability.

**3. Master and Servant § 68— workers' compensation—recovery under G.S. 97-31—disability not required**

G.S. 97-52 does not require that disability be shown as a condition to recovery under G.S. 97-31 for an occupational disease.

**4. Master and Servant § 68— workers' compensation—award for partial loss of lungs**

G.S. 97-31 applies to occupational disease, and "loss" as used in G.S. 97-31(24) includes loss of use. Therefore, an award for partial loss of lung function from an occupational disease falls within the scope of G.S. 97-31(24).

**5. Master and Servant § 68— workers' compensation—disability—partial loss of lungs—separate awards not permitted**

The Industrial Commission may not award plaintiff compensation under G.S. 97-52 and G.S. 97-29 for disability resulting from an occupational disease and also award compensation under G.S. 97-31(24) for partial loss of lung function because compensation under G.S. 97-31 is "in lieu of all other compensation."

Justice BILLINGS did not participate in the consideration or decision of this case.

Justice MEYER dissenting.

Chief Justice BRANCH joins in this dissenting opinion.

ON plaintiff's petition for further review pursuant to N.C. Gen. Stat. § 7A-31 (1981) of a decision of the Court of Appeals, 56 N.C. App. 697, 289 S.E. 2d 846 (1982),[2] reversing a worker's compensation award by the Industrial Commission.

2. The Court of Appeals' opinion was filed 6 April 1982 but on 17 May 1982 the Court of Appeals allowed Annie Mae Harrell's petition for a rehearing. New briefs

*Hassell & Hudson by Robin E. Hudson for plaintiff appellant.*

*Maupin, Taylor & Ellis, P.A., by Richard M. Lewis and David V. Brooks for defendant appellees.*

EXUM, Justice.

This is a lung disease case in which the Industrial Commission awarded plaintiff $4,000 in benefits for "permanent and irreversible loss of lung function" pursuant to N.C. Gen. Stat. § 97-31(24) (1979). Both plaintiff and defendants appealed to the Court of Appeals. Plaintiff contended that the Commission erred in not making an award for incapacity to earn wages due to lung disease. Defendants contended that the Commission erred in making any award because N.C. Gen. Stat. § 97-31(24) has no application to occupational disease cases unless plaintiff suffers death or disablement as a result of such disease. The Court of Appeals agreed with defendants and reversed the Commission. It concluded that while the Commission's findings were conflicting on whether plaintiff suffered any incapacity to earn wages as a result of an occupational disease, the evidence before the Commission would not have supported a finding that she did. It also concluded that N.C. Gen. Stat. § 97-31(24) had no application to occupational disease cases. The questions presented are: (1) Whether there is enough evidence in the record to support a finding by the Industrial Commission that some part of plaintiff's disability resulted from occupational disease and (2) whether N.C. Gen. Stat. § 97-31(24) has any application to occupational diseases.

I.

Evidence before the Commission consisted essentially of the testimony of Annie Mae Harrell, plaintiff-employee, and several physicians who treated or examined her. According to her testimony, Annie Mae Harrell was born 16 January 1925 in Johnston County and finished the eighth grade in school. She began working in the textile industry in 1943. She went to work in 1959 in defendant's North Henderson Mill in the weave room where she "filled batteries, weaved, smashed, cleaned up, trained battery

---

were prepared and submitted by the parties. Thereafter on 28 March 1983 the Court of Appeals determined that its order for rehearing was improvidently granted and rescinded the order.

fillers" and helped "blow off the top of the weave room and the looms." In 1962 she began to work in the winding room at the North Henderson Mill and worked until she quit work in June 1969. She testified:

> I first had breathing problems when I . . . worked in the weave room at [the North Henderson Mill]. I first remember when we were blowing off, we really were coughing and sucking in lint, a whole lot of lint. That would make me have a breathing problem. That was probably about 1960 I guess. I had breathing problems off and on the whole time at that time or after that time. . . .

Annie Mae Harrell quit work in order to look after her son who was ill, her husband having moved away and taken another job. She testified further:

> Since I have stopped working in the mill, the activities I have been able to do on a daily basis are I did my housework as long as I could. Since 1977 I haven't done very much housework . . . There are other kinds of activities besides my housework that I sure can't do any more. I knit . . . . I could get out and work in the garden and work in the yard and all. I can't do it no more. Since 1977 I haven't done anything.

Dr. Ted R. Kunstling, a physician specializing in pulmonary diseases, testified he first saw Mrs. Harrell on 5 October 1979. He took a history, conducted a physical examination, made laboratory studies and examined test results available to him from other medical sources. He felt her medical history "indicates that she was unable to perform even light housework" and "is not capable of working in the mill." Mrs. Harrell has no work experience except in the cotton mill industry, and her incapacity to earn wages is not controverted.

Dr. Kunstling's studies indicated "an amount of irreversible pulmonary impairment that was present at the time of examination." He attributed this impairment to a number of different lung diseases. X-rays revealed markings on the lung "consistent with pulmonary fibrosis . . . . Pulmonary fibrosis is a process of scarring which occurs in the lungs." Although "[i]t has a variety of causes," he testified "it cannot be the end results of long term ex-

posure to cotton dust. I do not think the results of scars is from exposure to cotton dust."

In response to a hypothetical question, Dr. Kunstling testified further as follows:

Based upon these facts and upon your examination of the plaintiff and your testing, do you have an opinion satisfactory to. yourself based upon a reasonable medical certainty as to whether or not her exposure to cotton dust in her employment could or might be a cause of her lung disease?

A: Yes, I do.

Q: What is that opinion?

A: I feel that there is an element of pulmonary impairment present which could have been contributed to by her cotton dust exposure.

Dr. Kunstling also testified:

I concluded that there were other factors in her history besides exposure to cotton dust that could have caused her problem. I feel like she has a pulmonary condition with pulmonary fibrosis and restrictive impairment which is co-existing with the amount of airway obstructive disease which is present. And that this is probably contributing to her pulmonary impairment to a certain extent. The etiology or the cause of this fibrosis is not known. And I can only state that fibrosis is a type of response which can't be correlated with her occupation. I believe there is some other causes for this. It is not uncommon for this type of disease to be present without there being a diminishable cause. In addition, she had others present: hypertension, and chronic rhinitis, and sinusitis.

"[A]ssessing the relative contribution of restrictive and obstructive diseases" to Mrs. Harrell's lung condition was "somewhat speculative" in Dr. Kunstling's judgment.

On cross-examination Dr. Kunstling testified "the vast majority of Mrs. Harrell's lung disease is restrictive in nature" but "she does have evidence of airway obstruction, and I believe this may be related to her cotton dust exposure and hence could be

termed 'byssinosis.' " Dr. Kunstling testified that Mrs. Harrell's "airway obstruction is something that may have been present from the time of her retirement from work to the present time" but that "the intervening process that has occurred has contributed significantly to her pulmonary impairment."

On redirect examination Dr. Kunstling testified, "Mrs. Harrell's obstructive lung disease may well have been caused by her exposure to cotton dust. I would say that she probably has obstructive impairment caused by cotton dust exposure."

With this evidence before it, the Commission, adopting the findings and conclusions of the Hearing Commissioner, made findings and conclusions as follows (paraphrased except where quoted):[3]

. . . .

3. Mrs. Harrell began to work at defendant's mill in Henderson in October 1959 where she was employed in the weave room. Her duties involved "filling batteries, weaving, smashing and cleanup activities" including blowing off the equipment by use of a compressed air hose. This mill processed cotton during Mrs. Harrell's employment. Dust accumulated to the extent that the looms were blown off two to three times weekly. At times Mrs. Harrell was required to be under cloth covering the looms while the looms were being blown off. Occasionally she would assist in the blow off operations "on an all-day basis."

. . . .

8. Dr. Ted Kunstling, a pulmonary expert and member of the Industrial Commission's Textile Occupational Disease Panel, saw Mrs. Harrell on 5 October 1979. He diagnosed her "as having pulmonary fibrosis (chronic restrictive lung

---

3. All parties stipulated: When the employee allegedly contracted her occupational disease, they were subject to and bound by the provisions of the Workers' Compensation Act; the employment relationship existed between the worker and the defendant employer; Liberty Mutual Insurance Company was the compensation carrier on the risk; the worker last worked for defendant-employer on 28 June 1969; her average weekly wage covering the one-year period before the date on which she last worked was $95.62; and defendant-employer's textile mills processed cotton during the worker's term of employment there.

disease) with moderate restrictive impairment as well as chronic obstructive lung disease with mild obstructive impairment. In Dr. Kunstling's opinion both conditions resulted "in permanent and irreversible pulmonary impairment in the range of 40 to 50 percent impairment of lung function" but he attributed the major element thereof to the fibrosis. Dr. Kunstling felt that Mrs. Harrell "is currently disabled from performing work with the exception of light work . . . and then only in a clean environment." In Dr. Kunstling's opinion Mrs. Harrell's "mild chronic obstructive lung disease, which he attributes to her occupational exposure to cotton dust, would not be significantly disabling in the absence of claimant's intervening pulmonary fibrosis which disease in his opinion is definitely not causally related to claimant's occupational exposure but rather is of unknown origin."

9. "As a result of her exposure to respirable cotton dust while employed within the weave and winding rooms of defendant-employer's textile mill claimant has contracted chronic obstructive lung disease (byssinosis) with evidence of permanent and irreversible airway obstruction. Plaintiff has contracted an occupational disease."

10. "Although at the time of her retirement claimant retained permanent and irreversible pulmonary impairment as a result of her occupational obstructive lung disease, she was not disabled (from work) as a result of this or any other physical condition until the year 1977, at which time she became disabled (from work) as a result of and following contracting non-occupational pulmonary fibrosis. The significant aspect of claimant's current pulmonary disability is as a result of her restrictive lung disease (pulmonary fibrosis) which arose independently of and following her voluntary retirement from the defendants' employ in 1969."

11. "At the time of her retirement and as a result of the aforenamed occupational disease, claimant has a permanent disability in that she has permanent injury to two important internal organs; to wit: her lungs, in the form of permanent and irreversible loss of lung function. It can be reasonably presumed that the claimant has suffered diminution of her future earning power by reason of such loss."

Upon the foregoing findings of fact the Commission made the following conclusions of law:

1. "Plaintiff has contracted chronic obstructive lung disease (byssinosis) with permanent and irreversible airway obstruction as a result of exposure to cotton dust in her employment with defendant employer. This disease is compensable under the provisions of G.S. 97-53(13) as it existed prior to its amendment in 1971. *Taylor v. J. P. Stevens and Co.,* Opinion filed on May 6, 1980 by the N.C. Supreme Court."

2. "As a result of the occupational disease giving rise hereto plaintiff has a permanent partial loss of both her lungs and is entitled to compensation in the amount of $4,000.00 therefor. G.S. 97-31(24) as it existed prior to its amendment in 1969. *Arrington v. Stone and Webster Engineering Corp.,* 264 N.C. 38, 140 S.E. 2d 759 (1965)."

Upon the foregoing findings of fact and conclusions of law the Commission made an award of $4,000.00 "for partial loss of lung function," attorney's fees and costs to Mrs. Harrell.

II.

Appellant's primary contention is that the Industrial Commission erred in failing to award benefits for disability resulting from occupational disease under N.C. Gen. Stat. §§ 97-52, 97-29. The Court of Appeals held the record lacked sufficient evidence to find that occupational disease caused any of Mrs. Harrell's incapacity to earn wages. It based that holding, in part, upon the fact that the chronic obstructive lung disease component of her pulmonary condition, the only component in her condition linked to cotton dust exposure, resulted not only from occupational exposure but also from other nonoccupational factors and "there is insufficient evidence from which the obstructive component . . . could be allocated between occupational and non-occupational causes." 56 N.C. App. at 701, 289 S.E. 2d at 848 (1982). The Court of Appeals, in other words, set aside the Commission's finding that Mrs. Harrell's obstructive lung disease was an occupational disease.

[1] Since the Court of Appeals had this case before it, we have decided *Rutledge v. Tultex Corp./Kings Yarn,* 308 N.C. 85, 301

S.E. 2d 359 (1983). *Rutledge* held obstruction caused by chronic obstructive lung disease need not be apportioned between occupational and nonoccupational causes and a claimant may recover the entire disability resulting from such obstruction so long as the occupation-related cause was a significant causal factor in the disease's development. *Id.* at 101, 301 S.E. 2d at 369-70. In this case there is sufficient evidence from which the Commission could have found that cotton dust exposure was a significant causal factor in the development of Mrs. Harrell's obstructive lung disease. Dr. Kunstling testified: "She probably has obstructive impairment caused by cotton dust exposure" and "I feel there is an element of pulmonary impairment present which could have been contributed to by her cotton dust exposure." The record, therefore, contains adequate support for the Industrial Commission's conclusion that Mrs. Harrell's entire obstructive lung disease was an occupational disease.

[2] Although the obstructive component of Mrs. Harrell's condition need not be apportioned between occupational and nonoccupational causes, the question remains whether the evidence is sufficient to find that her obstructive lung disease was the cause of any of her wage-earning disability. The Commission found as a fact that "[i]t can be reasonably presumed that the claimant has suffered diminution of her future earning power" as a result of loss of lung function caused by occupational obstructive lung disease. This finding would seem to be supported by Dr. Kunstling's testimony quoted above that obstructive impairment caused by cotton dust exposure was an element in Mrs. Harrell's pulmonary condition.

The Commission, however, made a contradictory finding as to the cause of Mrs. Harrell's disability:

[Mrs. Harrell] became disabled (from work) as a result of and following contracting non-occupational pulmonary fibrosis. The significant aspect of claimant's current pulmonary disability is as a result of her restrictive lung disease (pulmonary fibrosis) which arose independently of and following her voluntary retirement from the defendants' employ in 1969.

This finding is supported by other testimony of Dr. Kunstling that Mrs. Harrell's disease was mostly restrictive in nature.

In the face of these inconsistent fact findings, we think the proper course is to remand the case to the Commission to determine whether occupational or nonoccupational disease was the cause of Mrs. Harrell's disability. If the medical evidence would support a finding that her occupational, obstructive lung disease partially contributed to her disability and her nonoccupational, restrictive lung disease independently and not aggravated by occupational disease also partially contributed to her disability, she would be entitled to compensation for so much of her wage-earning incapacity as was attributable to her occupational disease. *See Rutledge*, 308 N.C. at 100, 301 S.E. 2d at 369; *Morrison v. Burlington Industries*, 304 N.C. 1, 14, 282 S.E. 2d 458, 467 (1981). In this case, however, the medical evidence does not permit any reasonable apportionment of her disability between occupational and nonoccupational disease. Dr. Kunstling characterized the task of "assessing the relative contribution of restrictive and obstructive elements" of Mrs. Harrell's disease as "speculative." Because the evidence will permit no such apportionment, plaintiff is entitled to an award for her entire disability if her occupational disease was a substantial and material factor in bringing about that disability. *Anderson v. Northwestern Motor Co.*, 233 N.C. 372, 375, 64 S.E. 2d 265, 267 (1951); *Vause v. Vause Farm Equipment Co.*, 233 N.C. 88, 92, 63 S.E. 2d 173, 176 (1951); *see* 1 Larson, Workmen's Compensation Law § 12-20 (1985) (nonoccupation-related disease of employee does not disqualify a claim if employment combined with disease to produce disability).

### III.

Even if the Industrial Commission determines that Mrs. Harrell's wage-earning disability was not substantially due to occupational disease, the Commission may consider awarding compensation under N.C. Gen. Stat. § 97-31(24). G.S. 97-31 is a schedule of losses for which compensation is payable even if a claimant does not demonstrate loss of wage-earning capacity. Losses included in the schedule are conclusively presumed to diminish wage-earning ability. *Perry v. Hibriten Furniture Co.*, 296 N.C. 88, 94-95, 249 S.E. 2d 397, 401 (1978); *Watts v. Brewer*, 243 N.C. 422, 424, 90 S.E. 2d 764, 767 (1956); *Loflin v. Loflin*, 13 N.C. App. 574, 577, 186 S.E. 2d 660, 662, *cert. denied*, 281 N.C. 154, 187 S.E. 2d 585 (1972).

[3]  Defendants argue no compensation may be awarded under G.S. 97-31 unless claimant suffers disablement or death as a result of occupational disease. They rely upon G.S. 97-52 which provides, "*Disablement or death* of an employee resulting from occupational disease . . . shall be treated as the happening of an injury by accident" within the meaning of the Workers' Compensation Act. N.C. Gen. Stat. § 97-52 (1979) (emphasis provided). Disablement (or death), they argue, is a condition that must occur before G.S. 97-52 makes occupational diseases compensable.

Defendant's argument is based on an overly technical reading of the statute. The purpose of G.S. 97-52 is to enable a worker to recover for disability caused by occupational disease under G.S. 97-29. The words "disablement or death" merely describe a condition that must occur before recovery may be had under G.S. 97-29. They do not predicate recovery under G.S. 97-31 upon disability. Recovery under that section, as noted above, is permitted regardless of actual ability or inability to earn wages. The obvious intent of the legislature in enacting G.S. 97-52 was to permit and not restrict recovery for occupational diseases. G.S. 97-52, therefore, does not require that disability be shown as a condition to recovery under the schedule for occupational disease.

The Court of Appeals, nonetheless, reversed the Commission's award under G.S. 97-31(24) and held that injury caused by occupational disease does not fall within the scope of that section. G.S. 97-31(24) provides:

In case of the *loss of* or permanent injury to any important external or internal organ or part of the body for which no compensation is payable under any other subdivision of this section, the Industrial Commission may award proper and equitable compensation not to exceed ten thousand dollars ($10,000).

N.C. Gen. Stat. § 97-31 (1979) (emphasis added). The Court of Appeals reasoned that lung damage caused by occupational disease could not be a permanent "injury" within the meaning of G.S. 97-31(24) because injury is defined in G.S. 97-2(6) so as not to include injury caused by occupational disease. Although G.S. 97-52 specifies that occupational disease resulting in "disablement" satisfies the injury requirement, that section does not, in cases of nondisabling disease, prevent the exclusion of disease from the

definition of injury. Because, in its judgment, Mrs. Harrell's disease was not disabling, her disease was not an injury and G.S. 97-31(24) could not apply.

We need not decide whether the Court of Appeals is correct that "injury" caused by occupational disease is outside the scope of G.S. 97-31. The Industrial Commission did not make an award to Mrs. Harrell under G.S. 97-31(24) for "injury" to her lungs but for partial "loss of both her lungs."

[4] The only question that need concern us is whether "loss" as used in G.S. 97-31(24) means loss of use. This question is one of legislative intent. We believe the legislature intended for G.S. 97-31 to apply to occupational disease and hold that loss as used in G.S. 97-31(24) includes loss of use.

All the organs of the body have a function and when an organ ceases functioning in whole or in part, it is a loss to the body as surely as if it or that part which no longer functions were physically detached. In Mrs. Harrell's case, it is hard to imagine that the removal of that part of her lungs affected by occupational disease could have any greater debilitating effect upon her than the loss of the use of those affected parts. She testified:

> Since 1977 I haven't done very much housework . . . . There are other kinds of activities besides my housework that I sure can't do anymore . . . . I could get out and work in the garden and work in the yard and all. I can't do it no more. Since 1977 I haven't done anything.

Our interpretation that loss means loss of use is not novel nor is it inconsistent with the compensation scheme enacted by the legislature. The legislature has provided in G.S. 97-31(19) that with respect to the extremities and the optic organ, loss of use "shall be considered as the equivalent of loss." N.C. Gen. Stat. § 97-31(19) (1979).

If loss does not mean loss of use in G.S. 97-31(24) and the Court of Appeals is correct that "injury" as used in that same section does not include injury caused by disease, we will have foreclosed the schedule as a means of compensating victims of occupational disease. We do not believe the legislature intended such a result. G.S. 97-59 requires an employer to provide medical treatment "in cases in which awards are made for disability *or damage to organs* as a result of occupational disease. . . ." N.C.

Gen. Stat. § 97-59 (Supp. 1983) (emphasis provided). The legislature must have intended for occupational disease to be compensable under the schedule or it would not have expressly provided that medical treatments be provided both in cases of disability and in cases of damage to organs. Furthermore, we are mindful that the legislature intends for the Workers' Compensation Act to be construed liberally in favor of the injured worker to the end that its benefits not be denied upon technical, narrow or strict interpretation. *Cates v. Hunt Construction Co.*, 267 N.C. 560, 148 S.E. 2d 604 (1966). Finally, when confronted with this issue on another occasion, the Court of Appeals also decided the legislature intended G.S. 97-31 to apply in occupational disease cases. *Cook v. Bladenboro Cotton Mills*, 61 N.C. App. 562, 300 S.E. 2d 852 (1983); *see also Priddy v. Cone Mills*, 58 N.C. App. 720, 294 S.E. 2d 743 (1982); *Hundley v. Fieldcrest Mills*, 58 N.C. App. 184, 292 S.E. 2d 766 (1982) (upholding awards in occupational disease cases under the schedule).

We hold, therefore, an award for partial loss of lung function does fall within the scope of G.S. 97-31(24).

[5] In summary, the Industrial Commission, on remand of this case, may find that claimant had a disability resulting from an occupational disease and make an award under G.S. 97-52 and 97-29. There is also evidence from which the Commission could find that no disability resulted from an occupational disease. It may then award compensation under 97-31(24) for partial loss of lungs. It cannot, however, make an award under both sections because compensation under G.S. 97-31 is "in lieu of all other compensation." N.C. Gen. Stat. § 97-31 (1979). *See Fleming v. K-Mart Corp.*, 312 N.C. 538, 324 S.E. 2d 214 (1985); *West v. Bladenboro Cotton Mills*, 62 N.C. App. 267, 302 S.E. 2d 645 (1983); *Cook v. Bladenboro Cotton Mills, supra.*

The decision of the Court of Appeals is reversed and the case remanded to that court for further remand to the Industrial Commission so that it may conduct further proceedings consistent with this opinion.

Reversed and remanded.

Justice BILLINGS did not participate in the consideration or decision of this case.

Justice MEYER dissenting.

I respectfully dissent from the majority opinion.

The claimant cannot recover under G.S. § 97-29 or G.S. § 97-30 because the Commission found that her disability *arose from and following her contraction of pulmonary fibrosis, a nonoccupational related condition,* which she contracted long after her retirement from the defendant's service. Likewise, claimant cannot recover under G.S. § 97-31(24) based upon findings of disability, presumed or proven, related to an occupational disease. If, indeed, disability exists, the recovery must be had pursuant to G.S. § 97-29 or 97-30.

This claimant has already received an award of $4,000 pursuant to G.S. § 97-31(24) of which the majority apparently approves, as it has not set that award aside but simply remanded the case for consideration of an *alternative* recovery under G.S. § 97-29 or 97-30. The majority apparently recognizes that if the claimant suffers disability (i.e., inability to earn wages) and recovers for total or partial disability under G.S. § 97-29 or 97-30, she cannot then recover under G.S. § 97-31(24), or vice versa. G.S. § 97-31 plainly provides that recovery thereunder "shall be in lieu of all other compensation." The majority clearly concedes that recovery cannot be had under both G.S. § 97-29 or 97-30 and G.S. § 97-31(24).

The North Carolina Workers' Compensation Act, as it relates to occupational diseases, is very specific and does not support the majority's conclusion. I need only repeat what this Court said in *Hansel v. Sherman Textiles,* 304 N.C. 44, 51-52, 283 S.E. 2d 101, 105 (1981):

> G.S. 97-52 provides in effect that disablement of an employee resulting from an "occupational disease" described in G.S. 97-53 shall be treated as the happening of an injury by accident. This section provides specifically:
>
>> The word "accident" . . . shall not be construed to mean a series of events in employment of a similar or like nature occurring regularly, continuously . . . whether such events may or may not be attributable to the fault of the employer and *disease attributable to such causes shall be compensable only if culminating in an oc-*

*cupational disease mentioned in and compensable under this article.* (Emphasis added.)

G.S. 97-53 contains the comprehensive list of occupational diseases for which compensation is provided in the Act.

By the express language of G.S. 97-53, only the diseases and conditions enumerated therein shall be deemed to be occupational diseases within the meaning of the Act.

Byssinosis is not "mentioned in and compensable under" the Act, except by virtue of G.S. 97-53, which provides in pertinent part as follows:

Section 97-53. Occupational diseases enumerated; . . . the following diseases and conditions only shall be deemed to be occupational diseases within the meaning of this Article:

. . . .

(13) Any disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.

My interpretation of our Act is detailed in *Morrison v. Burlington Industries*, 304 N.C. 1, 282 S.E. 2d 458 (1981). It suffices here to say only that any disease, in order to be compensable, must be an *occupational disease*, or must be *aggravated or accelerated* by an occupational disease or by an injury by accident arising out of and in the course of the employment. G.S. § 97-53 (13); *Booker v. Medical Center*, 297 N.C. 458, 256 S.E. 2d 189 (1979); *Anderson v. Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265 (1951). We also said in *Hansel*: "The clear language of G.S. 97-53 is that for any disease, other than those specifically named, to be deemed an 'occupational disease' within the meaning of the Article, it must be 'proven to be due to,' causes and conditions as specified in that statute." *Hansel v. Sherman Textiles*, 304 N.C. at 52, 283 S.E. 2d at 105. I fail to see how the "significant contribution" principle can satisfy the "proven to be due to" requirement of the statute.

I also continue to adhere to my position that there is no basis in law or in fact for the proposition that "for the purposes of awarding workers' compensation benefits, there is no practical difference between chronic obstructive lung disease and byssinosis." There is indeed a vast practical difference in "chronic obstructive lung disease" and "byssinosis." Chronic obstructive lung disease can be due solely to any one or a combination of diseases such as asthma, emphysema, bronchitis, etc., which may be totally unrelated to an individual's occupation. It is correct to say that whether chronic obstructive lung disease is compensable depends upon other factors. In my view, those factors are aggravation or extenuation by conditions of the workplace. The claimant here does not have an occupational disease as defined in our Workers' Compensation Act because her condition is due to pulmonary fibrosis. It is obvious that whatever condition this claimant might have could not have been aggravated or accelerated by the inhalation of cotton dust because she had not been exposed to cotton dust during the numerous years of her retirement before the onset of her pulmonary fibrosis.

However, even if I could agree with the principles expressed in *Rutledge v. Tultex Corp./Kings Yarn*, 308 N.C. 85, 301 S.E. 2d 359 (1983), and that those principles are applicable to this claimant's situation, the medical evidence in this case does not meet the *Rutledge* requirement of "a significant contributing factor."

Even in *Rutledge*, the majority required that the occupation-related cause be "*a significant causal factor*" in the disease's development. Even the medical evidence most favorable to the claimant in this case does not meet the "significant" contribution test. The majority flatly holds that it is sufficient if the pulmonary impairment "could have been contributed to" by the occupation-related cause. The majority's acceptance of something less than the *Rutledge* standard is obvious, and its holding in this regard is internally contradictory. I quote from the majority opinion:

In this case *there is sufficient evidence from which the Commission could have found that cotton dust exposure was a significant causal factor* in the development of Mrs. Harrell's obstructive lung disease. Dr. Kunstling testified: "She probably has obstructive impairment caused by cotton dust ex-

posure" and "I feel there is an element of pulmonary impairment present which *could have been contributed to* by her cotton dust exposure." The record, therefore, contains adequate support for the Industrial Commission's conclusion that Mrs. Harrell's entire obstructive lung disease was an occupational disease. (Emphasis added.)

In order to properly address what I believe to be the majority's primary error, it is necessary to recount briefly the procedural course of this claim prior to its reaching this Court.

The claimant filed a claim on 25 July 1979, seeking disability benefits for lung disease which she claimed was related to cotton dust in her prior textile mill employment. On 27 May 1980, Deputy Commissioner Lawrence B. Shuping, Jr., issued his opinion and award, wherein he found that the claimant had contracted an occupational disease, but that she was not disabled from work as a result of the occupational disease or any other physical condition until the year 1977, at which time she became disabled from work as a result of and following contraction of a nonoccupational pulmonary fibrosis. Deputy Commissioner Shuping concluded, as a result of the occupational disease which he found, that claimant had suffered permanent injury to two important internal organs and that it could reasonably be "presumed" that she had suffered a diminution of her future earning power by reason of such loss. The Deputy Commissioner subsequently awarded the claimant $4,000 for permanent damage to her lungs pursuant to the provisions of G.S. § 97-31(24). The Full Industrial Commission (Commissioner Robert S. Brown dissenting) affirmed the Deputy Commissioner's opinion and award.

The claimant appealed to the Court of Appeals from the decision of the Industrial Commission, and the defendants cross-appealed. Based upon the cross-appeals, the Court of Appeals held that the Industrial Commission had erred, as a matter of law, in awarding benefits for an occupational disease under the provisions of G.S. § 97-31(24). *Harrell v. Harriet & Henderson Yarns*, 56 N.C. App. 697, 289 S.E. 2d 846 (1982).

The claimant-appellant petitioned the Court of Appeals for a rehearing pursuant to Rule 31, and the rehearing was allowed. On 29 March 1983, the Court of Appeals entered an order rescinding

the previous order granting the petition for rehearing and denied the claimant's petition.

Any fair and impartial review of the evidence presented in this case will reveal overwhelming evidence in support of the Commission's finding that the claimant's presumed disability resulted entirely from a nonoccupational pulmonary fibrosis of unknown etiology. I would point out that the claimant had not been exposed to cotton dust since she last worked in a weave room, which was more than 16 years prior to her death, and she had not worked at all since her voluntary retirement from defendant's employment over 15 years ago. She was not examined by Dr. Kunstling, on whose testimony the majority relies, until 1979, some 10 years after she retired. The claimant's evidence tended to show that she had worked for many years in cotton mills and had last worked for defendant Harriet & Henderson Yarns in 1969. Her reason for leaving the mill employment was related to the transfer of her husband and was unrelated to her health. Thereafter, the claimant remained at home in order to care for her son. The claimant testified to the occurrence of "cold symptoms" prior to leaving the defendant's employ, but there was no evidence that she suffered disability, or severe breathing problems, until 1977.

Medical evidence presented at the hearing clearly showed that the claimant suffered from chronic lung disease which rendered her incapable of physical exertion. The medical evidence overwhelmingly attributed claimant's lung impairment primarily to nonoccupational "restrictive lung disease." There was some evidence, however, that claimant also suffered from "obstructive lung disease," which Dr. Ted R. Kunstling, of the Textile Occupational Disease Panel, thought "could have been contributed to by her cotton dust exposure." Dr. Kunstling further stated that it would be "speculative" for him to assess any relative contribution of obstructive impairment to the claimant's overall condition and stated that the tests "indicate that the impairment is restrictive" in nature.

The claimant's major exception involves that portion of the Full Commission's Finding of Fact No. 10, which states:

. . . at which time she became disabled (from work) *as a result of* and following contracting *nonoccupational pulmo-*

*nary fibrosis.* The significant aspect of claimant's current pulmonary disability is as a result of her restrictive lung disease (pulmonary fibrosis) *which arose independent of and following her voluntary retirement from the defendant's employ* in 1969. (Emphasis added.)

Dr. Kunstling stated that "[p]ulmonary fibrosis is a process of scarring which occurs in the lungs . . . . It cannot be an end product of long-term exposure to cotton dust." He further stated his belief that the intervening process (pulmonary fibrosis) which had occurred (after the claimant left work) had contributed significantly to her pulmonary impairment. Additionally, his comment, contained within his written evaluation, specifically states that:

This minor degree of airway obstruction (from cotton dust) would probably not be significantly disabling in the absence of restrictive lung disease.

Dr. Kunstling also testified that he believed the claimant to be unable of performing even light housework as the result of her impaired pulmonary function and that he believed the spirometric tests indicated that the claimant's impairment was restrictive. Dr. Kunstling's notes of 5 October 1979 also reflect the fact that in 1977 the claimant began experiencing increased difficulty with breathing, which he ascribed to her pulmonary fibrosis with moderate restrictive pulmonary impairment.

Dr. Allen H. Lee's notes also indicate that, to his knowledge as her family physician between 1949 and 1977, she had no respiratory complaint prior to 1977.

A third physician, Dr. Harvey Grode, testified with respect to the etiological factor behind the claimant's lung disease. He testified that:

I did *not* arrive at a diagnosis of byssinosis with regard to Mrs. Harrell. . . . It is still my opinion that I prefer to look upon it as if *Mrs. Harrell were suffering from pulmonary fibrosis of unknown etiology.* (Emphasis added.)

Additionally, the claimant introduced into evidence medical records from Eastern North Carolina Hospital in Wilson, North Carolina. Those records contained the opinions of several physicians who treated the claimant during 1978. One physician, Dr. H. Banerjee, stated:

X-ray of the chest shows peribronchial fibrosis, particularly at the bases, extending up to the costodiaphragmatic recesses, from the cardiac margins. She had been investigated in the past, and was proved to be tuberculosis negative. There are some granulomatous appearances in the rest of the lung field, which are faint, *and this corresponds to her history of having worked on a farm, especially with all kinds of vegetables, tobacco, and even in close contact with the soil.*

Based on the foregoing, it is readily apparent that there is overwhelming evidence to support the Commission's finding that the claimant's disability resulted from a nonoccupational related pulmonary fibrosis. The evidence overwhelmingly *rebuts* any finding that the claimant had contracted obstructive pulmonary disease as a result of occupational exposure. There is not one scintilla of evidence to indicate that at the time of claimant's retirement she was suffering from any permanent impairment, of any form. Specifically, the claimant testified that around the time she quit work in 1969, she was having cold symptoms, but that she left work because her husband had moved away and taken another job and she needed to be around to take care of a sick son. Dr. Kunstling's testimony indicated that the claimant was not noticeably impaired from performing work at the time she stopped in 1969 and that the history which he had received indicated that the claimant was more symptomatic in 1979 than she had been at the time of her retirement 10 years earlier. This essentially echoed the remarks which Dr. Kunstling had made in his formal evaluation report, wherein he stated, "Mrs. Harrell's history suggests that she was not significantly impaired at the time she stopped working in 1969 . . . ."

Additionally, Dr. Allen H. Lee of Selma, North Carolina, the claimant's family physician, wrote a short note (which was stipulated into evidence) in which he stated that he had known the claimant since 1949 and that "from 1949 until 1977, she had no lung disease that I am aware of. . . . As far as I know, she had no lung symptoms before July 1977."

There is a plethora of evidence to support the finding that claimant's impairment arose as the result of pulmonary fibrosis

and not as the result of obstructive lung disease due to cotton dust exposure.

The consensus of all the testimony with respect to the nature of the claimant's impairment is perhaps best set forth in the concluding paragraph of Dr. Kunstling's report:

> It is my feeling that Mrs. Harrell was not disabled at the time of her retirement, that her restrictive pulmonary impairment is not characteristic of cotton dust exposure, but that she may have a *minor* element of airway obstruction which *could have been* exacerbated by exposure to cotton dust. This minor degree of airway obstruction would probably not be significantly disabling in the absence of restrictive lung disease. (Emphasis added.)

This testimony assuredly does not meet the "significant causal effect" test.

I would also note that I find some aspects of the majority opinion quite confusing. The opinion seems to approve apportionment in this language:

> [W]e think the proper course is to remand the case to the Commission to determine whether occupational or nonoccupational disease was the cause of Mrs. Harrell's disability. If the medical evidence would support a finding that her occupational, obstructive lung disease partially contributed to her disability and her nonoccupational, restrictive lung disease independently and not aggravated by occupational disease also partially contributed to her disability, she would be entitled to compensation for so much of her wage-earning incapacity as was attributable to her occupational disease.

Yet it seems to actually hold that the facts here do not permit apportionment:

> In this case, however, the medical evidence does not permit any reasonable apportionment of her disability between occupational and nonoccupational disease. Dr. Kunstling characterized the task of "assessing the relative contribution of restrictive and obstructive elements" of Mrs. Harrell's disease as "speculative."

I also find the majority opinion confusing on the question of whether disability (i.e., inability to earn wages) is required in this claimant's situation. The majority opinion seems to require a showing of "disability":

Because the evidence will permit no such apportionment, plaintiff is entitled to an award for her entire disability if her occupational disease was a substantial and material factor in bringing about that disability.

Yet, the majority seems to go further and hold that the existence of a "disability" is not a predicate to recovery:

Disablement (or death), they argue, is a condition that must occur before G.S. 97-52 makes occupational diseases compensable.

Defendant's argument is based on an overly technical reading of the statute. The purpose of G.S. 97-52 is to enable a worker to recover for disability caused by occupational disease under G.S. 97-29. The words "disablement or death" merely describe a condition that must occur before recovery may be had under G.S. 97-29. They do not predicate recovery under G.S. 97-31 upon disability. Recovery under that section, as noted above, is permitted regardless of actual ability or inability to earn wages.

Frankly, I am unable to determine what the majority holds in this regard.

I would hold that the Court of Appeals was correct in refusing to allow the award of benefits pursuant to G.S. § 97-31(24) because it was based on a finding of disability (i.e., inability to earn wages) related to an occupational disease. If there is disability, recovery must be pursuant to G.S. § 97-29 or 97-30.

I would also hold that the Court of Appeals was correct in refusing to remand to the Industrial Commission for an award pursuant to G.S. § 97-29 or 97-30 because the Commission had already found that claimant's disability *arose from and following the contraction of nonoccupational related pulmonary fibrosis.*

Chief Justice BRANCH joins in this dissenting opinion.