***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioners Berger and Young and the briefs and arguments before the Full Commission, including supplemental briefs requested by the Full Commission after the North Carolina Supreme Court's opinion in Austin vs. Continental GeneralTire, ___ N.C. _____ (November 9, 2001, N.C. Supreme Court). The appealing party has shown good ground to reconsider the evidence, receive further evidence and to amend the prior Opinion and Award. The Full Commission therefore reverses in part and affirms in part the Opinion and Award of the Deputy Commissioner with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff was employed by Fluor Daniel's predecessor in interest, Daniel International Corporation at the DuPont facility in Brevard, North Carolina during 1975, 1976, 1977 and 1978.
2. The parties are subject to the North Carolina Workers' Compensation act, since Fluor Daniel employed the requisite number of employees to be bound under the provisions of the Act.
3. The workers' compensation carrier for Daniel International Corporation's employees at the DuPont facility in Brevard, North Carolina was American Motorists Insurance Company (Kemper) during the time that plaintiff was employed by Daniel International Corporation at the DuPont facility. United States Fidelity and Guaranty Company (USFG) was the workers' compensation carrier for Daniel International Corporation at most facilities other than DuPont facilities from at least January 1, 1970 through October 31, 1991. To the extent that the Industrial Commission's records indicate that USFG was on risk for Daniel International Corporation before January 1, 1970, USFG agrees to be bound by those records for the purpose of this claim.
4. The parties stipulate the following documents into evidence:
 a) Stipulated Exhibit A: plaintiff's social security wage printout
 b) Stipulated Exhibit B: plaintiff's medical records from Charles W. Scowcroft, M.D., Veteran's Administration Medical Center including those from Joseph L. Skibba, M.D., Bryan L. Woods, M.D., Dymphna Natto, M.D., Everette L. Darga, M.D., Ziad A. Al-Assaad, M.D., and Chang-Hsu Yang, M.D.
 c) Stipulated Exhibit C: plaintiff's personnel records from Fluor Daniel.
 ***********
Based upon all the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was 66 years old in 1999. He spent most of his working career as a sheet metal mechanic and sheet metal mechanic foreman. He worked for several companies in the mid-1960s and early 1970s where he was exposed to asbestos-containing insulation while performing ductwork in close proximity to insulators.
2. Plaintiff worked for Fluor Daniel, Inc., at the DuPont, Brevard, North Carolina facility from November 3, 1975 through October 20, 1976 and then again from October 3, 1977 through May 11, 1978. DuPont Brevard is a multi-acre x-ray film manufacturing facility, which contained miles of insulated steam and other process pipes as well as insulated vessels, ducts and equipment. The reason for the insulation was to protect the pipes, vessels and equipment and to keep workers from coming into contact with them.
3. During the entirety of his employment with defendant at the DuPont facility, plaintiff worked as a sheet metal mechanic. In that capacity, plaintiff fabricated ductwork, tore out existing ductwork and installed ductwork throughout the facility. In order to remove existing ductwork, plaintiff cut through or removed pocket locks and companion angles, cut through the insulation and removed it from the ductwork and then removed the ductwork itself. These ducts were located both throughout the plant and on the roof in and around insulated piping.
4. Plaintiff fabricated ductwork in the fabrication shop and cut through asbestos-containing gaskets in order to get those gaskets to fit the circumference of the ducts.
5. Plaintiff was exposed to the hazards of asbestos during the entirety of his employment with defendant while cutting asbestos-containing gaskets, while personally removing asbestos-containing insulation with his hands or hammers and while working in close proximity to insulators, millwrights, other sheet metal mechanics, instrument fitters, electricians, etc., who were removing asbestos-containing insulation from ducts, pipes and equipment on a daily basis.
6. Plaintiff was provided no respiratory protection throughout his entire employment with defendant nor was he warned about the hazards of breathing asbestos dust.
7. Plaintiff and other workers were performing "turnarounds" and general maintenance work on existing pipes, ductwork and vessels at the DuPont facility.
8. When the asbestos-insulation was removed from existing pipes, ducts and vessels, the insulation would drop to the floor and the dust would become airborne.
9. Plaintiff assisted the insulators who were involved in tearing out asbestos-containing insulation. Plaintiff routinely helped the insulators remove the insulation in order to get the job done quicker.
10. At the end of the day, both plaintiff and other laborers performed clean up work with brooms and air hoses to clean up the asbestos-containing insulation and other debris which had fallen to the floor and onto pipes, ducts, vessels and equipment. This clean up work created a large amount of asbestos dust.
11. Plaintiff cut into Armstrong asbestos gaskets, Victor gaskets, asbestos rope and packing material and Monokote and other asbestos insulation.
12. Plaintiff also assisted welders, and at times, used asbestos-containing fire blankets and asbestos gloves. When performing welding work, plaintiff used asbestos-containing insulation and used it as an impromptu fire blanket. Plaintiff was exposed to asbestos fibers from that insulation.
13. Plaintiff used a claw hammer to remove from ducts and pipe Monokote asbestos-containing mud and mastics (covering materials), which had been caked on pipes and ductwork. This caused the product to fall to the floor creating clouds of asbestos dust.
14. Plaintiff was exposed to the hazards of asbestos-containing insulation and dust every day that he was in the plant.
15. Existing insulation contained on the process piping (hot piping) at the DuPont facility contained asbestos during the time plaintiff worked at that facility.
16. During the time that plaintiff worked in the plant, none of the procedures recommended in DuPont's "E-1 Asbestos Dust-Control and Measurement" policy to contain or control asbestos dust was followed.
17. Plaintiff's former boss, sheet metal foreman and superintendent, Henry Lumpkin, directed plaintiff's daily activities and observed plaintiff being exposed to asbestos. Insulation General Foreman, James Dickson, observed plaintiff being exposed to asbestos in the plant. Plaintiff's coworkers, Charles Galloway and Thomas Wright, also saw plaintiff being exposed to asbestos daily while working in the plant.
18. Plaintiff was last injuriously exposed to the hazards of asbestos for at least 30 days in a seven-month period while in the employment of defendant from November 3, 1975 through October 20, 1976 and from October 3, 1977 to May 11, 1978.
19. Dennis Edwards, defendant's safety manager from 1980 forward, never worked with plaintiff and cannot refute any testimony about asbestos exposure provided by plaintiff and plaintiff's coworkers.
20. Subsequent to leaving the employ of Fluor Daniel at the DuPont, Brevard facility, plaintiff was never again exposed to asbestos.
21. A chest film and CT scan of plaintiff were taken on November 23, 1996 and were read by board certified radiologist, NIOSH certified B-Reader and North Carolina Dusty Trades Reader, Dr. Frederick M. Dula. The PA and lateral chest film findings showed "interstitial changes in the lower two-thirds of both lungs, consisting of irregular linear densities," and a "small diaphragmatic plaque on the right which would be consistent with early asbestosis given a history of asbestos exposure."
22. The CT scan of that same date showed "mild diffuse-type pleural thickening bilaterally," "a few mild interstitial abnormalities . . . including short, thickened interlobar lines extending to the pleural surfaces . . . which would be consistent with very early asbestosis given a history of asbestos exposure."
23. Dr. Dula rendered an opinion to a reasonable degree of medical certainty and as a specialist practicing in the field of diagnostic radiology, that plaintiff had radiographic findings consistent with asbestosis and the Full Commission so finds.
24. Dr. Albert F. Curseen, an expert pulmonologist and former member of the North Carolina Advisory Medical Panel, examined plaintiff on February 20, 1997 and diagnosed him as having asbestosis. Dr. Curseen based his diagnosis on the patient's work history, the CT scan and chest film from November 23, 1996 and the latency between exposure and onset of the disease. Dr. Curseen noted in his history that plaintiff was exposed to large amounts of dust including asbestos dust while working as a sheet metal mechanic and while working as a pipe fitter for many years. Additionally, Dr. Curseen diagnosed plaintiff as having colon cancer.
25. Dr. Curseen testified that when he examined plaintiff on January 7, 1999, plaintiff exhibited all three of the American Thoracic Society criteria for finding asbestosis. Specifically, plaintiff had a sufficient latency period between exposure and onset of the disease and objective radiographic findings. Dr. Curseen testified that to a reasonable degree of medical certainty, plaintiff has asbestosis and the Full Commission finds that such asbestosis resulted directly from plaintiff's work with defendant.
26. Dr. James C. Johnson, board certified radiologist, NIOSH certified B-Reader and North Carolina Industrial Dusty Trades Reader, performed a review of a CT scan and chest x-ray dated November 12, 1999 and performed a B-read of the chest film. The CT report showed "some localized pleural thickening" and "minimal non-calcified plaque," which would be "consistent with asbestos exposure given appropriate clinical findings and exposure history." PA and lateral chest films showed "mild, increased irregular interstitial opacities in the mid and lower lung field in a low profusion pattern." The B-read performed of the chest film showed parenchymal abnormalities consistent with pneumoconiosis consisting of t-shaped opacities in the lower two-third lung zones and a 1/1 profusion rating.
27. Dr. Johnson rendered an opinion to a reasonable degree of medical certainty that based on his own interpretation of the 1999 radiology as well as the 1996 CT scan, and the Full Commission finds as a fact, there are "mild pleural changes and minimal interstitial changes consistent with asbestosis given appropriate clinical findings and history and latency."
28. Dr. Goodman, defendants' expert radiologist, testified that there are some small bilateral pleural plaques existing on plaintiff's CT scan. Dr. Goodman stated that bilateral pleural plaques are rarely seen unless there has been asbestos exposure. Dr. Goodman stated that, while he does not believe plaintiff has asbestosis, he could not state this with complete certainty.
 Plaintiff presented for defendant's Independent Medical Examination with pulmonologist, Dr. Michael DiMeo. The Deputy Commissioner excluded Dr. DiMeo's deposition testimony. The Full Commission reverses the Deputy Commissioner on this point, admits his deposition testimony into evidence and includes it in the Full Commission's consideration of this case.
30. Plaintiff was diagnosed as having colon cancer in August 1993 resulting in a colectomy in September of that same year.
31. In March 1995, plaintiff's cancer returned and he underwent a resection from the small bowel. Since having two resections (1993 and 1995), plaintiff has undergone repeat colonoscopies every two years to determine whether or not his cancer has returned.
32. Dr. Groth, a former Chief of Pathology for NIOSH, who is board certified in pathology and by training, an epidemiologist, testified that based upon his review of plaintiff's individual case, his 35 years of experience and the medical literature, he can state to a reasonable degree of medical certainty that plaintiff's colon cancer is causally related to his occupational exposure to asbestos while working for defendant and the Full Commission finds that it is.
33. Plaintiff presented to Dr. John Craighead, a pathologist, for another Independent Medical Examination for defendant. Dr. Craighead testified that he does not believe that there is a causal relationship between asbestos exposure and the development of colon or rectal cancer regardless of whether or not the individual has evidence of an asbestos-related disease elsewhere in the body. Dr. Craighead's opinions are opposed to those of the EPA, NIOSH, and OSHA regarding whether there is a causal relationship between asbestos exposure and colon cancer.
34. The opinions of Dr. Curseen, Dr. Johnson, Dr. Dula and Dr. Groth are given greater weight than the opinions of Dr. Craighead, whose opinions are opposed to EPA, NIOSH, OSHA and who consistently dismissed the multitude of prior research supporting the associations between colon cancer and asbestos as simply "outdated work," and Dr. Goodman, whose work dealt primarily with lung cancer and had little to do with colon cancer.
35. Throughout plaintiff's employment with defendant, plaintiff was injuriously exposed to asbestos and asbestos dust. Up to the time plaintiff left his employment with defendant, plaintiff was injuriously exposed to the hazards of asbestos in excess of 30 working days, or parts thereof, within seven consecutive months.
36. Plaintiff has asbestosis, a scheduled occupational disease, as a result of his occupational exposure to asbestos during the course and scope of his employment with defendant and which is a characteristic fibrotic condition of the lung caused by the inhalation of asbestos fibers.
37. There is no evidence in the record to establish that plaintiff was exposed to the hazards of asbestos subsequent to his employment with defendant.
38. Plaintiff was last injuriously exposed to the hazards of asbestos while employed by defendant and during the period of coverage by Kemper Insurance Company.
39. The Full Commission finds in the case at bar that based upon the competent medical evidence admitted into the record that plaintiff contracted colon cancer, as a result of his occupational exposure to asbestos. While it may be caused by such exposure, colon cancer is a disease separate and distinct from asbestosis.
40. Based upon the competent medical evidence in the record, plaintiff's colon cancer was due to causes and conditions characteristic of and peculiar to plaintiff's employment with defendant, which is not an ordinary disease of life to which the general public is equally exposed outside of his employment.
41. Plaintiff's exposure to asbestos in his employment placed him at an increased risk for contracting asbestosis and colon cancer over the general public not so exposed.
42. In the 52 weeks prior to his retirement in 1989, plaintiff earned a salary of $10,671.00, which yields an average weekly wage of $205.21, and a weekly compensation rate of $136.81. Plaintiff has not returned to work in any capacity for defendant or any other employer.
43. Plaintiff's asbestos exposure has caused him to have permanent injury to each lung, each lung being a separate important internal organ.
44. Plaintiff's asbestos exposure has caused him to have permanent injury to his colon, an important internal organ.
45. Plaintiff timely filed his workers' compensation claim.
46. At the time of his retirement and as a result of the aforenamed occupational diseases, claimant had permanent disabilities in that he has permanent injury to three important internal organs; to wit: his lungs, in the form of permanent and irreversible loss of lung function, and his colon, in the form of permanent and irreversible loss of colon function. It can be reasonably presumed that plaintiff has suffered diminution of his future earning power by reason of such loss.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff was, up until the time he left his employment with defendant in 1978, injuriously exposed to the hazards of asbestos in excess of 30 working days, or parts thereof, within seven consecutive months. Plaintiff contracted the occupational disease of asbestosis while in the employment of defendant. This last injurious exposure of plaintiff occurred during the coverage period of Kemper Insurance Company. N.C. Gen. Stat. § 97-57; N.C. Gen. Stat. § 97-53(24); and N.C. Gen. Stat. § 97-62.
2. Plaintiff's claim for compensation due to asbestosis was timely filed. N.C. Gen. Stat. § 97-58.
3. Plaintiff has asbestosis and asbestos-related colon cancer, which are occupational diseases due to causes and characteristics of and peculiar to his employment with defendant, which are not an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53(24).
4. Plaintiff was not taken out of employment because of his exposure to asbestos and is not entitled to 104 weeks of compensation as a result of his diagnosis of asbestosis. N.C. Gen. Stat. § 97-61.5, Austin vs.Continental General Tire, ___ N.C. _____ (November 9, 2001, N.C. Supreme Court).
5. Having contracted asbestosis, plaintiff is entitled to recover weekly compensation at the rate of $136.81 per week for each week that he is unable to earn wages by reason of his occupational disease. However, there is no showing that plaintiff has been unable to earn wages by reason of his occupational disease.
6. Plaintiff is entitled to compensation in the amount of $20,000.00 for the permanent injury of an important internal organ, his colon, due to his occupational disease of asbestos-related colon cancer. He is also entitled to compensation in the amount of $20,000.00 for permanent injury to each lung. N.C. Gen. Stat. § 97-31(24).
7. Plaintiff is entitled to have defendants pay for all medical expenses incurred or to be incurred, as a result of plaintiff's asbestosis and asbestos related colon cancer as may be required to provide relief or effect a cure. N.C. Gen. Stat. § 97-25; N.C. Gen. Stat. § 97-25.1; and N.C. Gen. Stat. § 97-59.
8. The carrier, Kemper Insurance Company, was on the risk at the time of plaintiff's last injurious exposure and is, therefore, liable for payment of compensation due plaintiff pursuant to the Act. N.C. Gen. Stat. § 97-57.
9. Plaintiff is not entitled to an additional 10% of the total award. N.C. Gen. Stat. § 97-12.
10. Defendants argue that the North Carolina Supreme Court's opinion inHarrell v. Harriet Henderson Yarns, 314 N.C. 566, 336 S.E.2d 47(1985) to the effect that disability need not be proved in order to recover the benefits of N.C. Gen. Stat. § 97-31(24) was overruled by the Supreme Court's opinion in Wilkins v. J.P. Stevens, 333 N.C. 449,426 S.E.2d 675 (1993). We do not believe that is so.
It is true that Chief Justice Exum, who wrote the Court's opinion in both cases, did write in Wilkins:
 Physical impairment alone is not compensable under the Act. For any physical impairment, including that caused by an occupational disease, to be compensable under the Act, it must be shown that the impairment has caused the claimant to have an incapacity for work.
 Wilkins, supra, 426 S.E.2d at 678. However, said in the context ofWilkins the words were merely a generalized statement of law not intended to eliminate the specific language of 97-31(24):
 In case of the loss of or permanent injury to any important external or internal organ or part of the body for which no compensation is payable under any other subdivision of this section, the Industrial Commission may award proper and equitable compensation not to exceed twenty thousand dollars ($20,000).
In Wilkins the plaintiff did suffer from a disabling condition which was found not to be caused by his work. Therefore there was no need to apply or overrule the law set forth in Harrell and the generalized statement quoted by defendants is mere obiter dictum.
In Harrell, Justice Exum wrote:
 Even if the Industrial Commission determines that Mrs. Harrell's wage-earning disability was not substantially due to occupational disease, the Commission may consider awarding compensation under N.C. Gen. Stat. § 97-31(24). G.S. § 97-31 is a schedule of losses for which compensation is payable even if a claimant does not demonstrate loss of wage-earning capacity. Losses included in the schedule are conclusively presumed to diminish wage-earning ability. Perry v. Hibriten Furniture Co., 296 N.C. 88. 94-95. 249 S.E.2d 397. 401 (1978); Watts v. Brewer, 243 N.C. 422, 424, 90 S.E.2d 764, 767 (1956); Loflin v. Loflin, 13 N.C. App. 574, 577, 186 S.E.2d 660, 662. cert denied, 281 N.C. 154. 187 S.E.2d 585 (1972).
 Defendants argue no compensation may be awarded under G.S. § 97-31 unless claimant suffers disablement or death as a result of occupational disease. They rely upon G.S. § 97-52 which provides, "Disablement or death of an employee resulting from occupational disease . . . shall be treated as the happening of an injury by accident" within the meaning of the Worker's Compensation Act. N.C. Gen. Stat. § 97-52 (1979) (emphasis provided). Disablement (or death), they argue, is a condition that must occur before G.S. § 97-52 makes occupational diseases compensable.
 Defendant's argument is based on an overly technical reading of the statute. The purpose of G.S. § 97-52
is to enable a worker to recover for disability caused by occupational disease under G.S. § 97-29. The words "disablement or death" merely describe a condition that must occur before recovery may be had under G.S. § 97-29. They do not predicate recovery under G.S. § 97-31 upon disability. Recovery under that section, as noted above, is permitted regardless of actual ability or inability to earn wages. The obvious intent of the legislature in enacting G.S. § 97-52 was to permit and not restrict recovery for occupational diseases. G.S. § 97-52, therefore, does not require that disability be shown as a condition to recovery under the schedule for occupational disease.
* * *
 The only question that need concern us is whether "loss" as used in G.S. § 97-31(24) means loss of use. This question is one of legislative intent. We believe the legislature intended for G.S. § 97-31 to apply to occupational disease and hold that loss as used in G.S. § 97-31(24) includes loss of use.
 All the organs of the body have a function and when an organ ceases functioning in whole or in part, it is a loss to the body as surely as if it or that part which no longer functions were physically detached. * * *
 G.S. § 97-59 requires an employer to provide medical treatment "in cases in which awards are made for disability or damage to organs as a result of occupational disease. . . ." N.C. Gen. Stat. § 97-59
(Supp. 1983) (emphasis provided). The legislature must have intended for occupational disease to be compensable under the schedule or it would not have expressly provided that medical treatments be provided both in cases of disability and in cases of damage to organs. Harrell v. Harriet Henderson, 314 N.C. 566, 336 S.E.2d 47 (1985).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees hereafter provided, defendants shall pay to plaintiff $20,000.00 for the permanent injury of an important internal organ, his colon, due to his asbestos-related colon cancer, $20,000.00 for the permanent injury to his left lung and $20,000.00 for the permanent injury to his right lung, both caused by asbestosis. Compensation due which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fees hereinafter provided.
2. Defendants shall pay for all of plaintiff's medical expenses incurred or to be incurred, as a result of his compensable occupational diseases of asbestosis and colon cancer when bills for the same have been presented in accordance with the provisions of the Act.
3. A reasonable attorney's fee of 25% of the compensation due under Paragraph 1 of this Award is approved for plaintiff's counsel. Defendants shall deduct that sum and shall pay it directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This 12th day of February 2002.
 S/_____________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________________________ BUCK LATTIMORE CHAIRMAN
S/_____________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER