The hearing Deputy properly determined that the greater weight of the medical evidence does not support defendant's contention that the auto accident was an intervening cause of plaintiff's temporary total disability. When, as the Deputy found here, the relative contributions of compensable and non-compensable injuries to a condition cannot be reasonably divided, compensation is due for the entire disability, and apportionment based on speculation is not required. Gray v.Carolina Freight Carriers, 105 N.C. App. 480, 489, 414 S.E.2d 102
(1992); Harrell v. Harriet Henderson Yarns, 314 N.C. 566, 575,336 S.E.2d 47 (1985).
Plaintiff asked the Commission to take punitive action due to the defendant's termination of benefits despite the Commission's denial of two Form 24 applications for permission to stop payment of compensation. These were denied because plaintiff's right to compensation had not been established, by either admission or order, and thus there was no award which the Commission might determine had or had not been satisfied. No Form 21 or other agreement to pay compensation ever was, or has been, submitted to the Commission for its approval. The employer may discharge its obligation with voluntary payments "so long as the amount of compensation and the time and manner of payment are in accordance with the provisions" of the Act, which is assured by the requirement that an agreement be "filed with and approved by the Commission" in a "form prescribed by the Industrial Commission." N.C.G.S. §§ 97-17 and 97-82. While the defendant sought the Commission's leave to stop paying compensation, it did not make the conventional agreement that would submit it to the Commission's administration of compensation awards, and thus denied plaintiff that protection. As defendant argues in its brief, "the defendant never accepted plaintiff's claim as compensable through a Form 21 filed or other formal acknowledgment filed with the Industrial Commission." But some special payments were being made to the plaintiff because of the injury — 14 weeks' worth, according to defendant's declaration on its November 4, 1991 Form 24 — and not from a sickness and accident fund or private disability program that provided benefits to a class of employees, regardless of the cause of disability, such as our Courts have found are entitled to be credited and offset against compensation due pursuant to G.S. § 97-42. Estes v. N.C. StateUniversity [I], 89 N.C. App. 55, 58, 61, 365 S.E.2d 160 (1988). The payments came from defendant Alexsis, the employer's workers' compensation claims administrator, and no denial letter, as then required by I.C. Rule 601 "within twenty-one (21) days from the date that a determination is made to deny the claim," was ever sent. It would be unjust now to offset payments made in this status against compensation due. "Otherwise, compensation defendants could voluntarily pay without offering the claimant the agreement contemplated by the Act (see G.S. §§ 97-17, 18(b) and -82), and thus deny the claimant important legal rights (seeWatkins v. Central Motor Lines, Inc., 279 N.C. 132, 137,181 S.E.2d 588 (1971)) unless and until claimant is willing to litigate for them, and even refuse to report the injury to the Commission in violation of § 97-92(a), with the sole consequence being a maximum fine of $25.00." Carlton v. Sara Lee, I.C. No. 040863, 4 January 1994. The law also prohibits substitution of paid leave earned by the employee and other insurance or benefits in lieu of workers' compensation insurance benefits. N.C.G.S. § 97-6; Estes v. N.C. State University [II], 102 N.C. App. 52, 58,401 S.E.2d 384 (1991); Ashe v. Barnes, 255 N.C. 310, 314,121 S.E.2d 549 (1961).
In accordance with the parties' stipulations, and without objection, the Form 22 Wage Chart submitted by defendant dated October 18, 1993 is accepted into evidence. N.C.G.S. § 97-85.
To the extent plaintiff's counsel's letter of August 27, 1993 requests a reopening of the evidence, said motion is DENIED, without prejudice to plaintiff's right to seek a further award on the grounds of change of condition per G.S. § 97-47, or to prosecute a separate claim for a subsequent injury.
Upon review of all of the competent evidence of record with reference to the errors assigned, and otherwise finding no good ground to reconsider the evidence or receive further evidence, the Full Commission MODIFIES, and as MODIFIED, AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. At the time of the injury by accident giving rise hereto, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, with defendant-employer regularly employing three or more employees, one of whom was plaintiff.
2. Defendant is a duly qualified self-insured for workers' compensation insurance purposes and Alexsis, Inc. is its claims administrator.
3. Plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant on May 9, 1991.
4. Plaintiff returned to work on July 10, 1992.
* * * * * * * * * * *
Based upon all the competent credible evidence of record, the Full Commission makes the following additional
FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was 27 years old and a high school graduate, and had worked in a restaurant, in a furniture company, and in a clothing business before starting to work for defendant employer's predecessor in 1988 as a flight attendant whose duties included providing safety, evacuation and medical treatment and helping board passengers as well as serving food and beverages to them.
2. He sustained the injury by accident giving rise hereto on May 9, 1991 when the airplane hit some turbulence whereupon eight meal trays fell off an overhead shelf and struck him in the right shoulder and right side of his face as he began to stand up from a squatted position. As a result, he fell backwards and twisted his low back and felt severe pain in his low back as well as soreness in his right shoulder and right face. No Form 21 Agreement has been submitted to and approved by the Commission for this injury by accident. Employer, through its workers' compensation claims administrators, did make cash payments to plaintiff due to the injury for an undetermined period of time before ceasing payment.
3. Prior to May 9, 1991, plaintiff had never experienced any back, neck, or shoulder injuries or problems. Although he had scoliosis as a child, he had no back pain.
4. From May 10 through May 15, 1991 plaintiff was followed by physicians at Pro Med South in Charlotte and received conservative treatment including medications and soaks for lumbar strain, cervical strain, and musculoskeletal pain. By the time he came under Dr. Oweida's care on May 22, 1991, his neck pain had subsided but he continued to experience severe low back pain. On examination, he had significant low back pain on the straight leg raising test but no radiation of pain into his legs and there was no clinical evidence of a ruptured disc causing compression of a nerve root. Treatment prescribed included continuation of medications and physical therapy to the low back. Physical therapy was scheduled to be performed in Florida where plaintiff had his primary residence. In addition, he maintained a residence in Charlotte.
5. When examined by Dr. Oweida on June 5, June 19, and June 28, 1991, he continued to have significant low back pain during the straight leg raising test, with no radiation and his condition remained essentially the same both subjectively and objectively as it had been on May 22, 1991. On or about June 28, 1991 Dr. Oweida learned that the physical therapy which plaintiff had been receiving in Florida had been directed to the neck instead of the low back area and he contacted the physical therapist in order to correct this.
6. By the time of his examination on July 9, 1991, plaintiff had been receiving physical therapy to his low back and he was experiencing a little less pain in his back. Though he remained unable to return to work as a flight attendant, his back condition was in the process of resolving but had not yet resolved and he was continued on daily physical therapy and medication. An MRI scan of the lumbar spine which was performed on July 1, 1991 and which had been ordered by Dr. Oweida reflected, among other things, mild degenerative disc disease at L5-S1 with dehydration of the disc at that level and intraosseous herniation of disc material into the body of L5, into the body of S1, and into the body of L1. Intraosseous herniation, otherwise known as Schmorl's node, is a condition where the disc herniates into the bone, or end plate which is the interface between the disc and vertrebral body, instead of into the spinal canal. The MRI was negative for compression of nerve roots.
7. On July 21, 1991 plaintiff was involved in a motor vehicular accident wherein he was unable to stop his car from colliding head-on with a car which had pulled in front of him going the wrong way on a one-way street. Plaintiff, who was wearing a seat belt, struck his nose on the steering wheel thereby fracturing his nose.
8. When next seen by Dr. Oweida on July 30, 1991, plaintiff's chief complaints were face and neck pain though he reported that the motor vehicular accident had aggravated his low back. On examination, straight leg raising continued to produce back pain with no radiation. Objectively, there was no change in his low back examination from past examinations and he was continued on physical therapy. Following the motor vehicular accident of July 21, plaintiff experienced increased low back pain for about one to two weeks after which his low back pain returned to about the same level it had been before that accident. By the time of his examination on August 6, the affects of the motor vehicular accident were beginning to subside, but he was still having enough low back pain from the injury by accident giving rise hereto that he was unable to return to work and he had not reached maximum medical improvement from said injury by accident and the treatment rendered therefore.
9. While plaintiff was under the care of Dr. DeCardenas at West Gables Rehabilitation Hospital and Healthcare Center in August 1991 receiving physical therapy for his neck injury sustained in the July 21, 1991 motor vehicular accident, Dr. Jacobson saw him for a consultation on August 9 because x-rays reflected questionable fracture of C6. On straight leg raising test plaintiff had low back pain without radiation and he had neck pain on hyperextension. Following examination and review of the July 1, 1991 MRI as well as tomograms done on August 14 which were negative for cervical fracture, Dr. Jacobson cleared plaintiff to proceed with physical therapy. By the time Dr. Jacobson again saw plaintiff on August 27, 1991, plaintiff reported that the more therapy he received, the more he experienced low back pain. MRI performed on August 28, 1991 revealed intraosseous herniation into the vertrebral body end plates and disc of L5, irregularity and flattening of the L5-S1 disc and dehydration of the L5-S1 disc. There was no dramatic anatomical change in the findings on that MRI as compared to the one performed on July 1, 1991.
10. When plaintiff was again examined by Dr. Jacobson on August 30, 1991, he was still complaining of significant low back pain despite having received about three weeks of intensive in-patient physical therapy at the Rehabilitation Hospital. Dr. Jacobson then gave plaintiff three options: Continue therapy; undergo a percutaneous diskectomy; or undergo a laminectomy.
11. Plaintiff thereafter opted to undergo percutaneous diskectomy, and on September 17, 1991, a discogram was first performed which confirmed an abnormal disc at L5-S1, to wit: tears into the disc. Dr. Jacobson then performed percutaneous diskectomy at L5-S1 for treatment of the herniated disc. Postoperatively, Dr. Jacobson saw plaintiff in follow-up through February 19, 1992. By that date, plaintiff continued to have some low back pain, but it was of decreased severity compared to the level it had been prior to the operation. By February 19, 1992 plaintiff obtained the end of the healing period and reached maximum medical improvement from the injury by accident giving rise hereto and the treatment rendered therefore. As a result of said accident, he sustained 8.5% permanent partial impairment of the back. As of February 19, 1992, he was able to return to his preinjury employment, with the only restriction being no repetitive bending.
12. When plaintiff returned to work as a flight attendant for defendant on July 10, 1992, he continued to experience low back pain which thereafter worsened when he bent over and lifted things and when he twisted while performing his job duties. By the date of the hearing on October 27, 1992, his low back pain was constant, throbbing pain. However, he was able to earn the same wages in this employment as he had prior to the injury, with the exception of periods totaling two weeks during September 1992.
13. As a result of the injury by accident of May 9, 1991 plaintiff sustained intraosseous herniation at L5-S1 and aggravation of preexisting asymptomatic degenerative disc disease at that level which rendered him unable to earn any wages in any employment from May 10, 1991 to February 19, 1992. While the motor vehicular accident of July 21, 1991 aggravated his disc, he was already unable to earn any wages at the time of that accident because of back pain he continued to experience from the injury by accident of May 9, 1991. In addition, his incapacitating back pain which continued beyond the July 21, 1991 motor vehicular accident and for which he underwent diskectomy was caused by the injury by accident of May 9, 1991 and was aggravated by the motor vehicular accident of July 21, 1991. There is no manner by which, to any degree of reasonable medical certainty, to quantify the relative degree of contribution to his permanent partial low back condition from the May 9, 1991 accident and the July 21, 1991 motor vehicular accident.
14. Plaintiff voluntarily drew paychecks from the employer during his periods of disability by using his vacation and sick days previously earned, and exhausted these as of the time he returned to work in July, 1992.
15. Plaintiff incurred expenses at the Keith Chiropractic Clinic and for the services of Dr. Joyce in Charlotte as a result of the compensable injury.
16. The parties stipulated at the hearing before the Deputy Commissioner that, "Plaintiff's average weekly wage amounts to $378.63, subject to a Form 22 or other wage documentation to be submitted by the defendant establishing a different amount." Said documentation, admitted into evidence hereinabove, shows that during the year preceding the injury, plaintiff earned an average weekly wage of $595.56, rendering a compensation rate of $397.05. That plaintiff is entitled to compensation at the rate of $397.05 per week.
* * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. As a result of the injury by accident of May 9, 1991, plaintiff is entitled to temporary totally disability benefits from that date through February 19, 1992, and for an additional two weeks of lost work time in September, 1992. N.C.G.S. § 97-29.
2. Plaintiff is entitled to benefits for an 8.5% permanent partial disability of his back resulting from the May 9, 1991 accident. N.C.G.S. § 97-31 (23).
3. Defendant is not entitled to credit for payments made to plaintiff in respect to his periods of disability as a matter of law, and to the degree such credit might be granted in the Commission's discretion pursuant to statute, the same should be, and hereby is, DENIED. N.C.G.S. § 97-42.
4. Defendant is obligated to pay bills for the above-mentioned medical services, and such other medical compensation as may tend to effect a cure, give relief, or shorten the period of disability resulting from plaintiff's injury by accident of May 9, 1991. N.C.G.S. §§ 97-25 and 97-2 (19); Hyler v.GTE Products Co., 333 N.C. 258, 425 S.E.2d 698 (1993).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendant shall pay to plaintiff 42 and 5/7ths weeks of temporary total disability benefits at the rate of $397.05 per week in lump sum, subject to the attorney fee hereinafter approved. N.C.G.S. § 97-29.
2. Defendant shall pay to plaintiff 25.5 weeks of permanent partial disability compensation at the rate of $397.05 per week, subject to the attorney fee hereinafter approved. N.C.G.S. § 97-31 (23).
3. A reasonable attorney's fee of 33 1/3% of the compensation hereinabove awarded is approved, and shall be deducted and paid directly to plaintiff's counsel for valuable services rendered. N.C.G.S. § 97-90.
4. Defendant shall pay the costs of medical compensation incurred by reason of the subject compensable injury when the bills for same have been submitted to, and approved by, the Commission. N.C.G.S. §§ 97-25 and 97-2 (19).
5. Defendant shall pay the costs, including an expert witness fee in the amount of $150.00 to Dr. Eisenberg and in the amount of $600.00 to Dr. Jacobson.
 S/ ___________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ _______________________ COY M. VANCE COMMISSIONER
S/ _______________________ FORREST H. SHUFORD, II SPECIAL DEPUTY COMMISSIONER
JRW/JS/tmd 11/30/94