The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner, with some modification. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the deceased and defendant-employer at all relevant times, specifically from 25 January 1954 until 1 February 1993.
3. Lumberman's Mutual Casualty Insurance Company was the carrier on the risk for defendant-employer from 1 January 1974 to 1 April 1984; thereafter, R.L. Stowe Mills was self-insured with Hewitt Coleman and Associates as its servicing agent.
4. A Form 22 is to be used to calculate the deceased's average weekly wage.
5. A packet of ninety-eight pages of medical records including the reports of Drs. Kelling, Kunstling and Harris was stipulated into evidence.
6. The issue to be considered is whether the deceased contracted chronic obstructive pulmonary disease due in significant part to his exposure to the hazards of respirable cotton dust during his history of employment in the cotton textile trade, and whether he sustained a severe permanent pulmonary impairment and injury to important internal organs. Also to be determined is which carrier, if any, is the carrier on the risk.
***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. After the hearing before the Deputy Commissioner, on 29 January 1997, Marvin Helms, original plaintiff (hereinafter "deceased") died from cardiac arrest due to causes unrelated to his job and alleged occupational disease. Following his death the parties requested that the record be kept open. On 16 February 1998, a death certificate for the deceased and an executed Agreement to Substitute Parties were submitted and became a part of the record in this case. The agreement provides that the survivors of Mr. Helms are his widow, Ruby Lucille Helms and his two adult sons, Randy Wayne Helms and Roger Dale Helms.
2. The deceased was born 5 June 1919 and moved to Gaston County in 1928. At the age of eight, plaintiff's father died. As a result of his father's death, the deceased left school during the fifth grade to help raise his brothers and sisters. Since beginning work at the age of sixteen, the deceased had no other training other than textile work.
3. The deceased's first job in the cotton textile industry was at the Cramerton Mill in the card room, running cards, stripping cards with a roller and working as a spare hand. While working with the Cramerton Mill, cotton was processed and the dust conditions were very bad.
4. The deceased worked at Cramerton Mill until he went into the military the first time in 1940. After serving in the military for a year, he went back to Cramerton Mill, worked for a year, and then re-entered the military in 1942 until 1945. Upon his discharge, he returned to Cramerton and worked until 1946 performing the same card room jobs that he performed when first employed by Cramerton Mill.
5. Upon leaving Cramerton Mill, the deceased went to work at the Imperial Mill in the card room where he was a spare hand. He worked at Imperial for a year and a half to two years during which time the mill processed cotton.
6. The deceased then went to work at Southfork Manufacturing where he also worked in the card room as a spare hand. This mill also processed cotton.
7. The deceased left Southfork Manufacturing when he began working with his last employer, National Yarn Mills owned by R.L. Stowe. He began working at National Yarn Mills on 25 January 1954 and worked there until 1 February 1993. In all the mills that the deceased worked, he used air hoses to blow dust off machinery. Blowing off the machinery would cause the dust levels to increase.
8. When the deceased first went to work at National, he was a fixer in the card room. However, his main job was keeping the pickers running, which he did for approximately four to five years.
9. The deceased later became a master mechanic assigned to the machine shop. Upon becoming a master mechanic, he spent seventy-five percent of his time in the card room. He spent very little time in the mechanic's shop. When he was not in the shop or the card room, he was in other departments of the mill. One of the reasons the deceased spent more time in the card room was to utilize his expertise in working on and repairing the card shop machines. He was always on call and often worked sixty to seventy hours a week. During deceased's entire employment at the National, cotton was processed.
10. In June 1984, the deceased began working part-time. He worked three eight-hour shifts on Friday, Saturday and Sunday. For about one year, he worked Sundays exclusively in winding and on Fridays and Saturdays he worked throughout the mill, including winding.
11. The deceased eventually moved to the carpentry shop, still continuing his three-day work-week. Once in the carpentry shop, he spent very little time in the various other departments of the mill. The deceased estimated that five percent of his time was spent in other departments. The conditions in the carpentry shop were very different from those experienced in his job as a master mechanic. Cotton was not processed in the carpentry shop. The deceased had no significant exposure to cotton dust subsequent to 1984.
12. The deceased began smoking cigarettes when he was ten or twelve years of age. Within four to five years, he began smoking a pack a day. He averaged a pack a day or better during the time he smoked. He ultimately quit in 1993 but sometime around 1994, he began smoking four to five cigarettes a day after meals and at bed time. The deceased continued to smoke until his death, despite doctors' recommendations that he stop completely.
13. Before working in cotton textiles, the deceased did not have any breathing problems. He noticed his first breathing difficulties about a year after he started working at Cramerton Mill. He coughed a great deal and his chest tightened up, making breathing difficult. His chest tightness and shortness of breath began one to two hours after he started his shift. When the deceased was off work on weekends, he was able to breathe better. The deceased described Mondays as his worst days in the mill in the 1930's and 1940's. The rest of the week he adjusted to the condition in the mill and his inability to breathe was not as bad as it was on Monday.
14. When the deceased was on vacation, his breathing improved. During his periods in the armed services, his breathing also improved. However, upon being discharged both times from the service and returning to the mills, his problems started again. As the deceased continued to work in cotton textiles, his breathing problems increased in severity. By 1980, his breathing problem bothered him every day he worked in the mill. By 1980, his breathing problem did not go away on the weekends, but he would notice some improvement from the work week. When he went to work part-time, his breathing problem had worsened to the point where he had difficulty walking a hundred feet.
15. The deceased also began to have heart problems in 1980, for which Dr. Kramer hospitalized him at Gaston Memorial Hospital and Presbyterian Hospital in Charlotte.
16. The deceased was examined by Dr. T. Reginald Harris of Shelby at the request of defendants; Dr. Ted Kunstling of Raleigh at the request of his attorney; and Dr. Douglas Kelling of Concord at the direction of the Industrial Commission.
17. The deceased had chronic obstructive pulmonary disease which had resulted in severe Class IV AMA pulmonary impairment.
18. In-plant pulmonary function testing was begun in 1980 and the results of the testing performed on the deceased were stipulated into evidence. In addition, the deceased's answers to respiratory surveillance questionnaires were stipulated into evidence. Neither the questionnaires nor the pulmonary function studies indicate that the deceased was having an acute reaction to the environment at defendant-employer's mill during the last time he was tested. The deceased revealed at the hearing before the Deputy Commissioner that he was not very forthcoming in responding to the questionnaires. However, by the 1980's, improvements were being made to alleviate dust problems in the mill and after 1984, deceased was not working predominantly in the card room and was not being exposed directly to cotton fiber dust. In the 1980's new machinery was installed in the mill enclosing chute feeders that went into the cards. After 1984 the dust levels in the mill were below OSHA standards.
19. Following the filing of this claim, the deceased was seen, at the direction of the Industrial Commission, by Dr. Douglas Kelling of Concord, a member of the Industrial Commission's textile occupational disease panel. Dr. Kelling's initial opinion, reflected in his report dated 12 October 1993 which was stipulated into evidence, was that the deceased suffered from severe obstructive lung disease including emphysema, hyper-reactive airways disease, and chronic bronchitis. According to Dr. Kelling, the deceased's chronic obstructive lung disease was due to cigarette smoking and there was no evidence of byssinosis, based upon information given in respiratory questionnaires and findings of pulmonary function tests before and after exposure to cotton dust.
20. After receiving a letter from the deceased's counsel dated 28 March 1994, Dr. Kelling stated, in a letter of 13 April 1994:
 "If we assume that Mr. Marvin Helms had minimal or no exposure to cotton dust during the time he was administered the respiratory questionnaires and the Pulmonary Function Test before and after working in the Carpentry Shop, I would have to agree that this information should not be used to try to determine whether or not the patient has byssinosis. Therefore, assuming this information is not relevant and given the history which the patient related to me during my pulmonary evaluation of October 12, 1993, I feel the patient does have byssinosis, Schilling Grade III."
21. After Dr. Kelling saw him, the deceased presented to Dr. Ted R. Kunstling of Raleigh Internal Medicine Associates, on 21 March 1994. According to Dr. Kunstling, the deceased had chronic obstructive pulmonary disease and both his cigarette smoking and occupational exposure to cotton dust contributed to this disease. The deceased's pulmonary disease, as identified by Dr. Kunstling, included asthma, bronchitis and emphysema.
22. Finally, Dr. T. Reginald Harris of Shelby saw the deceased on 7 June 1995. Dr. Harris' conclusion was that the deceased suffered from severe chronic obstructive pulmonary disease, including emphysema and chronic bronchitis, and that these diseases were not related to cotton dust exposure.
23. The Commission, after reviewing the medical evidence of record, including the written reports and depositions of the three physicians, gives greater weight to the revised opinion of Dr. Kelling and to the opinion of Dr. Kunstling than to that of Dr. Harris.
24. The deceased's long-term exposure to cotton dust prior to 1984 significantly contributed to the development of his chronic obstructive pulmonary disease and placed him at an increased risk of contracting the disease as compared to members of the public generally.
25. The deceased was at an increased risk of contracting chronic obstructive pulmonary disease as compared to members of the public generally while he worked in the card room.
26. There is no scientific method by which to apportion the degree of chronic obstructive pulmonary disease and resulting pulmonary impairment which was caused by exposure to cotton dust from that which was caused by cigarette smoking.
27. As of the deceased's last day worked on 1 February 1993, his severe chronic obstructive pulmonary disease was last proximately augmented to some degree by exposure to cotton dust from 1954 to the end of 1983, at which time Lumberman's Mutual Insurance Company was the carrier on the risk.
28. As a result of the occupational disease, the deceased sustained severe permanent impairment and injury to his lungs which are important internal organs. The fair and equitable amount of compensation is set forth in N.C. Gen. Stat. § 97-31(24).
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Due in significant part to the deceased's exposure to the hazards of respirable cotton dust during his history of employment in the cotton textile industry, the deceased developed severe chronic obstructive pulmonary disease. This disease was due to causes and conditions which are characteristic of and peculiar to deceased's trade, occupational employment, but excluding all ordinary diseases of life to which the public is equally exposed outside of that employment. The deceased thus contracted a compensable occupational disease. N.C. Gen. Stat. § 97-53(13). Hendrix v. Linn-Corriher Corp., 317 N.C. 179,345 S.E.2d 374 (1986); Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983).
2. The deceased's employment may not have been the sole cause of his chronic obstructive lung disease but it aggravated and augmented it. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 173 (1951).
3. As a result of his occupational disease, deceased sustained severe permanent impairment and injury to important internal organs, his lungs, for which his estate is entitled to compensation in the amount of Forty Thousand Dollars and 00/100 ($40,000.00). N.C. Gen. Stat. § 97-31(24). One-fourth of this amount is to be paid directly to the deceased's attorney for reasonable attorney's fees. Harrell v. Harriet Henderson Yarns,314 N.C. 566, 336 S.E.2d 47 (1985); Grant v. BurlingtonIndustries, Inc., 97 N.C. App 241, 335 S.E.2d 327 (1985).
4. The deceased was last injuriously exposed to the hazards of his occupational disease during the time Lumberman's Mutual Insurance Company was on the risk for defendant-employer R.L. Stowe Mills, Inc. prior to 1984 and said carrier, is accordingly, liable for the compensation by reason of the deceased's permanent injury to his lungs while he lived. N.C. Gen. Stat. §§ 97-62,97-61.5.
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant-employer R.L. Stowe Mills, Inc. and Lumberman's Mutual Insurance Company shall pay to the estate of the deceased as a result of deceased's severe permanent impairment and injury to his lungs, the sum of Forty Thousand and 00/100 Dollars ($40,000.00) which shall be paid in one lump sum, without commutation, subject to a reasonable attorney's fee approved in paragraph two of this Award.
2. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the lump sum award of benefits due under paragraph one of this Award is hereby approved at this time, which shall be deducted from the same Award and forwarded directly to the deceased's counsel.
3. Defendants R.L. Stowe Mills, Inc. and Lumberman's Mutual Insurance Company shall pay the costs due this Commission.
This the ___ day of May 1999.
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER
LKM/jth